2006 VT 67

## Lili Gamache v. James Smurro

[904 A.2d 91]

No. 04-342

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed July 14, 2006

*John J. Bergeron* and *David D. Aman* of *Bergeron Paradis & Fitzpatrick, LLP*, Burlington, for Plaintiff-Appellee.

*Brian K. Valentine* of *Downs Rachlin Martin PLLC*, Burlington, for Defendant-Appellant.

¶ 1. **Dooley, J.** Husband, James Smurro, appeals from a family court divorce order that distributed a portion of the equity in a property

located in California to wife Lili Gamache. Husband claims that the California property is not marital property because wife signed a prenuptial agreement prior to their California marriage that waived her right to any equity in the property. We find that the prenuptial agreement was modified and superseded by husband and wife's subsequent purchase of the entire property, which deeded a 100% undivided interest to both parties. Further, we hold that the family court's distribution of the property was equitable and not an abuse of its discretion. We affirm.

¶ 2. The parties were married in 1981 and lived together in California until July of 1992. They have one daughter, Clio, who was born in 1990. In 1992, when Clio was two years old, the parties separated amicably, and wife and daughter moved back to Vermont. Husband stayed in California and eventually moved to Massachusetts. He frequently saw both daughter and wife during the eleven years of separation. Wife currently has a bachelor's degree in Fine Arts, which she obtained before marriage, and husband has a bachelor's degree, as well as master's degrees in both Science and Engineering and Business Administration, all earned from Harvard University before the marriage. Husband has at times held high-level, well-paying positions, but is currently unemployed and seeking employment. Between 1998 and 2003, he earned over $600,000.

¶ 3. Following the separation, wife moved back to St. Albans. She acquired a home, a forty-percent interest in a downtown building, and a Subway franchise, the income of which supports her and her daughter. The money to make these purchases apparently came as a gift from her father. Between 1998 and 2003, wife made about $141,000, but at times her monthly income has equaled that of husband.

¶ 4. The main issue in this case involves the effect of a prenuptial agreement, so we recite the facts related to that agreement in some detail. Prior to the parties' 1981 marriage, husband owned an approximately ten-percent interest in a house and surrounding property located in San Clemente, California. The remaining interests were owned by his parents, Nicholas and Mary Rose Smurro, his sister, and his two brothers. Apparently, the house was used as a home by husband's father and mother. Prior to their marriage, wife signed a "prenuptial agreement" regarding this property, which reads:

I Lili Gamache am the spouse-to-be of James Paul Smurro.

I understand that as of this date, James Paul Smurro has a 10% ownership interest in 509 Via Florida, San Clemente and

is responsible for a proportionate 10% share of all mortgage payments, taxes, and insurance on said property, currently amounting to $265.00 a month.

I further understand that James Paul Smurro may buy additional shares of said property from his parents or siblings or may receive additional shares of said property from his parents or siblings as gifts or by will, and that such additional shares, however acquired, will require James Paul Smurro to pay the percentage of all mortgage payments, taxes, and insurance on said property which equals the percentage of ownership that he then has.

. . . .

I further understand that payments that James Paul Smurro makes to said property during our marriage may consist (in all or in part) of community property which, under California law, would otherwise consist of my one-half share of the same. I hereby specifically renounce any and all rights to any interest in 509 Via Florida, including any interest that otherwise would be my one-half share of community property with James Paul Smurro.

. . . .

I freely and willingly sign this Pre-Nuptial Agreement for each and all of the following reasons:

(1) My love and affection for James Paul Smurro who is to be my lawful wedded spouse.

(2) My understanding that the purchase of 509 Via Florida (an event that occurred before my engagement to James Paul Smurro) was contingent upon Nicholas A. Smurro, Sr., Mary Rose Smurro, Rosemarie Elizabeth Smurro, James Paul Smurro, Thomas Edward Smurro, Nicholas A. Smurro, Jr., and each of them mutually agreeing that said property, until completely sold, was to be owned only by the above-recited six individuals; that each of the four children, including James Paul Smurro, agreed to continue payments on said property, whether in a single or marital state; that all four children, including James Paul Smurro, agreed that upon the contempla-

tion of marriage, that he would secure a pre-nuptial agreement from his spouse-to-be which agreement would renounce any community property interest, or otherwise, in said property; that unless such a pre-nuptial agreement were obtained, then James Paul Smurro would forfeit his share of said property at fair market value less a prescribed penalty payment.

(3) That family cooperation and harmony are important to me and my renunciation of any and all interest in 509 Via Florida is more likely to foster such cooperation and harmony as I join the Smurro family as the spouse of James Paul Smurro without the burden of financial entanglements.

WHEREFORE, I LILI GAMACHE HEREBY RENOUNCE, FREELY AND WILLINGLY, NOW AND FOREVER, ANY AND ALL INTERESTS THAT I MIGHT OTHERWISE HAVE IN THE PROPERTY LOCATED AT 509 VIA FLORIDA, SAN CLEMENTE, CALIFORNIA.

As the agreement reflects, California is a community property state, as discussed *infra*. At the time of the agreement, the Smurro family did not contemplate that they would sell the property to husband and wife. Husband did not sign the agreement. After wife signed the agreement, the parties married.

¶ 5. Subsequently, in November of 1983, the parties purchased a 100% interest in the San Clemente property as an investment property. Husband's parents did not like the house and wanted to move to another property. The parties needed a tax shelter for some of their income. Although the evidence does not disclose the source of the purchase money, no party disputes it was purchased for valuable consideration.[1] The purchase was reflected in a deed to "JAMES PAUL SMURRO and LILI GAMACHE SMURRO, husband and wife as community property as to an undivided 100% interest." The deed was signed by each of the owners of the property, including husband. It

---

[1] Although husband indicates that the parties did not purchase the property for cash, it is undisputed that the property was purchased for valuable consideration. Husband testified that the interests of his parents and sister were compensated by allowing them to stay in the house rent free until the value of their interests were exhausted. He further testified that he "bought out" the interests of the other siblings. The deed also specifically notes the property was granted to husband and wife "for valuable consideration," which husband acknowledged in his testimony.

states that husband had previously "acquired title as a single man," apparently to indicate that, prior to this grant, it was not then held by him as community property with wife. Although the parties never lived in the property, wife contributed $40,000 from her earnings to support the property from 1983 until 1992. After the separation, husband assumed responsibility for the property and spent over $150,000 on management and upkeep. The parties had an understanding that his assumption of responsibility was in lieu of child support for the parties' child and maintenance for wife.

¶ 6. The prenuptial agreement was introduced late in the trial without disclosure in discovery. Wife testified that she had not seen the document in twenty years and that husband had never claimed it affected the title to the San Clemente property. Husband argued that the prenuptial agreement was enforceable and meant that wife had no interest in the San Clemente property. Wife argued that the prenuptial agreement was invalid, and that, in any event, it did not have the effect of making the San Clemente house separate property of husband. The family court accepted wife's arguments. On the interpretation issue, the court found:

> The Court further concludes that even if this agreement was valid when made, it does not bear on the distribution of real estate held jointly by the parties as husband and wife.
>
> . . . .
>
> The Pre-Nuptial Agreement before the Court is not a comprehensive agreement between the parties regarding the disposition of assets in the event of divorce. It relates only to a property interest Defendant at one time held as a joint tenant. Despite the language at the end of the Pre-Nuptial Agreement that Plaintiff was forever renouncing any interest in the California property, other provisions indicate the Agreement was intended to ensure that the interest Defendant had as a joint tenant with other members of the Smurro family would remain as separate property. The Agreement does not contemplate what actually occurred, that Plaintiff and Defendant would buy the entire property together as husband and wife. The Agreement does not address how the parties intended to divide the California property if held

jointly as husband and wife, and the Court will not construe it to bear on this issue.

On appeal, as husband's first ground for reversal, he disputes each of the family court's reasons for refusing to give effect to the prenuptial agreement and hold that the San Clemente house was husband's separate property.

■ ¶ 7. We agree with a variation of the court's decision on interpretation of the prenuptial agreement and do not reach the question of whether the agreement is valid. In reaching our result, we agree with the family court that California law governs the validity and interpretation of the prenuptial agreement made in California.[2] See *Stalb v. Stalb*, 168 Vt. 235, 241, 719 A.2d 421, 426 (1998) ("[I]f the [prenuptial] contract is valid where made, it will be interpreted here according to the law of the state of its making, so long as to do so will not violate the public policy of the State of Vermont."). Under either California or Vermont law, the prenuptial agreement is interpreted according to rules for construing a contract. See *Stalb*, 168 Vt. at 241, 719 A.2d at 426 (concluding an "antenuptial agreement is a contract"); *In re Marriage of Bonds*, 5 P.3d 815, 822 (Cal. 2000) (same). The intention of the parties at the time the contract is formed governs interpretation. *AIU Ins. Co. v. Superior Court*, 799 P.2d 1253, 1264 (Cal. 1990). Here, the family court found that it was not the intention of the contracting parties to address a situation where husband and wife jointly purchase the San Clemente property.

¶ 8. As noted above, California is a "community property" state, which generally means that upon marriage husband and wife form a sort of partnership and all property acquired during the marriage by the labor or skill of either belongs to both. 11 B.E. Witkin, Summary of California Law, Community Property § 1, at 374 (9th ed. 1990).

---

[2] The parties have assumed that California law also determines whether real property is separate property of one spouse and, if so, whether a court can distribute any interest in that property to the other spouse. We accept those assumptions without analysis. We note that the assumption appears to be consistent with the applicable choice-of-law rule in the Restatement. See Restatement (Second) of Conflict of Laws § 234 (1971). Indeed, the comment to the section indicates that "questions of the effect on an ante-nuptial contract upon the interests of the spouses in the land" are governed by the same rule. See *id.* cmt. b. Although we have not decided this question, we have adopted the Restatement rules "for choice-of-law questions in both tort and contract cases." *McKinnon v. F.H. Morgan & Co.*, 170 Vt. 422, 423, 750 A.2d 1026, 1028 (2000).

Property of married persons is either community or separate property. See Cal. Fam. Code §§ 760, 770 (1994). There is a presumption that property acquired during the marriage by either spouse is community property unless acquired by gift or inheritance or traceable to a separate property source. See *In re Marriage of Haines*, 39 Cal. Rptr. 2d 673, 681 (Ct. App. 1995). The presumption can be overcome by an agreement of the parties to the contrary. *Id.*; Cal. Fam. Code § 1500.

¶ 9. In this case, there is a basic conflict between the terms of the prenuptial agreement, as interpreted by husband, and the later deed conveying the title of the property jointly to husband and wife "as community property." Indeed, husband would not have joined in conveying the property by the deed he signed unless he intended to convert his separate interest in ten percent of the property, along with the other ninety percent being conveyed, into a community property interest with wife. Otherwise, the legal effect he alleges here, his sole ownership in the property, would have been accomplished if his parents and siblings had made a deed of the property solely to him.

¶ 10. The proper interpretation of the deed, and the property interest it creates, is addressed in part by a California statute, California Family Code § 2581,[3] which provides:

§ 2581. Division of property; presumptions

For the purpose of division of property on dissolution of marriage or legal separation of the parties, property acquired by the parties during marriage in joint form, including property held in tenancy in common, joint tenancy, or tenancy by the entirety, or as community property, is presumed to be community property. This presumption is a presumption af-

---

[3] Under § 2580(c), this statute applies in this case because this divorce proceeding was commenced after January 1, 1984, and no property settlement agreements or judgments were signed prior to January 1, 1987. We recognize there is an issue about the validity of the statutory effective dates, but the issue is not determinative of our decision. Prior to 1984, the subject of the statutory presumption was controlled by *In re Marriage of Lucas*, 614 P.2d 285 (Cal. 1980). The only difference relevant here between *Lucas* and the statute is that the statute requires a written agreement to override the presumption, while *Lucas* does not. See *In re Marriage of Papazian*, 2003 WL 21456625, at *3 (Cal. Ct. App. 2003). Because there is no claim of an oral agreement here, the *Lucas* rule and the statute produce the same result. See *id.*

fecting the burden of proof and may be rebutted by either of the following:

(a) A clear statement in the deed or other documentary evidence of title by which the property is acquired that the property is separate property and not community property.

(b) Proof that the parties have made a written agreement that the property is separate property.

Under this statute, the deed to husband and wife in this case must be presumed to create community property, unless the prenuptial agreement is an "agreement that the property is separate property."

¶ 11. The California Court of Appeals decided an almost identical case in *In re Marriage of Brown*, 2002 WL 1010083, at *1 (Cal. Ct. App. 2002),[4] holding that a prenuptial agreement was not an agreement that property is separate property under § 2581(b). In *Brown*, husband and wife entered into a prenuptial agreement specifying that husband would retain property owned by him before the marriage as separate property after the marriage. After the marriage, however, husband deeded the property to himself and wife as joint tenants, apparently to obtain a bank loan. In the divorce proceeding between them, husband argued that the property had not become community property because the prenuptial agreement rebutted any presumption arising under § 2581. The court disagreed, holding that "[a] later instrument supercedes an earlier one wherever they are inconsistent." *Id.* at *3. It went on to hold:

Here, the premarital agreement contains no express contemplation of property to be acquired in the future, thus this is not a case in which an earlier premarital agreement applies to later acquired property. The agreement applies to separate property already owned by the parties prior to marriage and states it shall continue to be held as separate property unless modified by later agreement. The deed was a later agreement.

---

[4] The decision is unpublished, and Rule 977 of the California Rules of Court prohibits courts from citing or relying on opinions not certified for publication or ordered published. Cal. Rules of Court Rule 977(a). Its prohibition is not, of course, binding on us. In any event, we do not rely on the decision as a binding statement of California law. We discuss it because we find it persuasive in its application of the governing statute.

*Id.*[5]

¶ 12. There are four differences between this case and *Brown*, but we judge that overall these differences strengthen wife's case and persuade us that the application of § 2581 as discussed in *Brown* applies here. First, the prenuptial agreement in this case does contemplate after-acquired property in the form of incremental increases in husband's ownership share. But, as the family court held, the prenuptial agreement did not contemplate a sale of 100% of the property interests to husband and wife. Indeed, the purpose of the prenuptial agreement — "family cooperation and harmony" — disappeared once husband and wife purchased the property outright. The agreement stated that each of the owners — husband's parents and siblings — had mutually agreed that the "property, *until completely sold*, was to be owned only by the above-recited six individuals." (Emphasis added.) As such, the prenuptial agreement had no purpose once the property was "completely sold." On this point, this case and *Brown*, although superficially different, are actually indistinguishable.

¶ 13. The second difference is that the prenuptial agreement in *Brown* had a modification clause, and the agreement in this case did not. Again, we do not believe the difference is significant to our holding. Whether or not the prenuptial agreement had a modification clause, the parties were free to modify it. For the exact same reason the *Brown* court found a modification in that case, we find a modification to the prenuptial agreement here.

¶ 14. The last two differences between the cases further support wife's position. Third, the *Brown* court found the deed was a modification where the grantor was the spouse who had originally received the property as separate property under the prenuptial agreement, as was the case here, but the conveyance was to the spouses "as joint tenants." *Id.* at *1. The husband had unsuccessfully argued the conveyance was made to obtain a loan with the property as collateral and not to affect the marital interests in the property between the spouses. Here, in

---

[5] The *Brown* holding necessarily involves the transmutation of the character of property from separate property to community property as a result of the deed. California Family Code § 852(a) requires that a transmutation be accomplished by a writing containing "an express declaration that is made, joined in, consented to, or accepted by the spouse whose interest in the property is adversely affected." *Brown* held that the deed was a writing meeting the requirements of § 852. *Brown*, 2002 WL 1010083, at *3. We adopt that holding.

contrast, the deed conveys the property to the spouses as "community property." Husband has offered no explanation for contradicting the explicit grantee language, and is in the untenable position of arguing that a deed explicitly conveyed by him to the spouses as community property does not create community property interests.

¶ 15. Fourth, there was clear evidence in this case that the parties acted as if the San Clemente house was community property as the deed stated. The family court found that the parties purchased the property after their accountant suggested they do so as a means of limiting their joint tax liability, and the parties do not dispute that they filed a joint income tax return. The court found that wife contributed $40,000 to the property before the parties separated, some of which included money obtained through the tax refunds from their joint tax return. The court also found that the parties had an agreement that husband would not contribute to child support for Clio or maintenance for wife, but would manage the California property instead.[6] Finally, wife testified without contradiction that husband never mentioned the prenuptial agreement between the date on which it was signed and the date of the divorce hearing.

¶ 16. As a leading contracts treatise summarizes:

> Even when the terms of a contract are clear and unambiguous, the subsequent conduct of the parties may evidence a modification of their contract. Accordingly, while their conduct may not be used to support an interpretation contrary to the plain meaning of the contract, it may nonetheless be used to prove the existence of a modification of the original contract terms.

11 S. Williston & R. Lord, A Treatise on the Law of Contracts § 32:14, at 503 (4th ed. 1999) (citing numerous cases from around the country and U.C.C. § 2-208(3)). The above-described facts are wholly inconsistent with husband's position that wife had no property interest in the San Clemente property. It is inexplicable that wife would put money into property in which she had no interest, or waive any entitlement to maintenance or child support for their child, in return for husband

---

[6] The trial court found this agreement unconscionable, but noted husband did substantially contribute to daughter's education, to both wife and daughter's health insurance, and to wife's IRA, and also bought wife a vehicle. We note the agreement only because it is inconsistent with husband's position that wife had no interest in the San Clemente property.

assuming the financial obligation for property in which she had no interest.

¶ 17. The facts bearing on whether the San Clemente property is separate or community property are undisputed. *Brown* addressed the strength of husband's position as follows: "Husband points to the earlier-in-time prenuptial agreement, but that agreement is clearly amended by the deed absent compelling evidence to the contrary and there is none." 2002 WL 1010083, at *5. On that basis, the court concluded that husband's appeal was frivolous. The appeal here is even weaker than that in *Brown*.

¶ 18. Husband was required to rebut the presumption of community property by clear and convincing evidence. See *Weingarten v. Superior Ct.*, 125 Cal. Rptr. 2d 371, 378 (Ct. App. 2002). Absent such proof, the presumption of community character "was absolute and conclusive." *In re Boody's Estate*, 45 P. 858, 860 (Cal. 1896). Although the family court here did not make a finding that the prenuptial agreement failed to rebut the presumption that the deed created a community property interest in wife, the court's finding that the prenuptial agreement was not intended to govern a complete sale of the San Clemente property to husband and wife implied such a finding. Accordingly, we affirm the court's conclusion that the San Clemente property became community property in 1983 because husband failed to rebut the presumption created by § 2581, and the deed of the property to husband and wife in 1983 superseded and modified the prenuptial agreement.

¶ 19. Husband's second ground for appeal is that the family court abused its discretion in distributing the marital property even if the San Clemente property is considered a marital asset. This is a very narrow issue because the parties agreed to the disposition of all other marital assets. In 1994, following the separation, the parties signed agreements that specified that any property each received as a gift, and "all property, assets and income generated from said property," would be considered separate property. Consistent with the agreement, each party waived any claim to property acquired by the other party after the separation. As a result of the waivers, the only remaining property in dispute was the San Clemente property and some stock in wife's family business corporation. The parties reached an agreement on distribution of the stock, leaving only the San Clemente property in issue.

¶ 20. The family court found that the total value of the San Clemente property was $930,000, based on an expert's appraisal. It concluded that the property's equity was $688,139, which included the proceeds of a new mortgage, $248,139, that was put in escrow by husband pending the divorce order. The court considered husband's premarriage ten-percent ownership and postseparation expenditure of $150,000 as well as wife's preseparation contribution of $40,000. Ultimately the court awarded wife the $248,000 mortgage proceeds, leaving husband the remaining $440,000 of equity in the house, as well as clear title.

¶ 21. The family court has broad discretion in dividing marital property, and we will uphold its decision unless its discretion was abused, withheld, or exercised on clearly untenable grounds. *Kasser v. Kasser*, 2006 VT 2, ¶ 30, 179 Vt. 259, 895 A.2d 134. The party claiming an abuse of discretion bears the burden of showing that the trial court failed to carry out its duties. *Id.* Distribution of property is not an exact science and, therefore, all that is required is that the distribution be equitable. *Id.* The statute contains a nonexclusive list of factors that the court may consider in reaching its decision. 15 V.S.A. § 751; *Semprebon v. Semprebon*, 157 Vt. 209, 215, 596 A.2d 361, 364 (1991).

¶ 22. In claiming that the court abused its discretion in the distribution of the value of the San Clemente property, husband argues that wife received a larger property distribution share overall, husband put much more into the San Clemente property than wife, and wife essentially abandoned the property. Husband asserts that he should therefore receive the full value of the property. In the family court, wife argued that husband's contribution to the San Clemente property was made in lieu of child support and maintenance and she should receive half its value.

¶ 23. The trial court made detailed findings in this case, and considered many of the statutory factors. It found that both parties will have an opportunity to acquire future assets. The court recognized husband's more substantial contribution to the California property by awarding him a sixty-four-percent share in that property. It concluded, however, that it should award wife some part of the property "to compensate her for her original investment and the $40,000 that she contributed to the house until 1992." Thus, she received the remaining thirty-six-percent share. The decision is a compromise between the extreme positions of the parties. We conclude that it fell within the broad discretion of the family court.

*Affirmed.*